UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

SHERLYN M.,[1]    )
           )
     Plaintiff, )
           )
     v.    )   No. 1:18-cv-02460-JRS-MPB
           )
ANDREW M. SAUL, Commissioner of the Social )
Security Administration,   )
           )
     Defendant. )

## ENTRY REVIEWING THE COMMISSIONER'S DECISION

Plaintiff Sherlyn M. ("Ms. M.") applied for disability insurance benefits ("DIB") and supplemental security income ("SSI") from the Social Security Administration ("SSA") on August 21, 2014, alleging an onset date of April 15, 2012. [ECF No. 5-6 at 4; ECF No. 5-6 at 11.] Her applications were initially denied on December 19, 2014, [ECF No. 5-4 at 2; ECF No. 5-4 at 6], and upon reconsideration on March 17, 2015, [ECF No. 5-4 at 11; ECF No. 5-4 at 14]. Administrative Law Judge Belinda J. Brown conducted a hearing on November 1, 2016 and issued an unfavorable decision on December 30, 2016. [ECF No. 5-3 at 50-53.] On July 13, 2017, the Appeals Council remanded the case back to an Administrative Law Judge to consider new and material evidence that had been submitted on appeal. [ECF No. 5-3 at 67-68.] Administrative Law Judge Ronald Jordan (the "ALJ") conducted a hearing on

---

[1] To protect the privacy interests of claimants for Social Security benefits, consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States courts, the Southern District of Indiana has opted to use only the first name and last initial of non-governmental parties in its Social Security judicial review opinions.

November 30, 2017. [ECF No. 5-2 at 44-61.] The ALJ issued a decision on December 19, 2017, concluding that Ms. M. was not entitled to receive DIB and/or SSI. [ECF No. 5-2 at 13.] The Appeals Council denied review on June 17, 2018. [ECF No. 5-2 at 2.] On August 10, 2018, Ms. M. timely filed this civil action asking the Court to review the denial of benefits according to 42 U.S.C. §§ 405(g) and 1383(c). [ECF No. 1.]

# I.
## STANDARD OF REVIEW

"The Social Security Act authorizes payment of disability insurance benefits … to individuals with disabilities." *Barnhart v. Walton*, 535 U.S. 212, 214 (2002). "The statutory definition of 'disability' has two parts. First, it requires a certain kind of inability, namely, an inability to engage in any substantial gainful activity. Second, it requires an impairment, namely, a physical or mental impairment, which provides reason for the inability. The statute adds that the impairment must be one that has lasted or can be expected to last … not less than 12 months." *Id.* at 217.

When an applicant appeals an adverse benefits decision, this Court's role is limited to ensuring that the ALJ applied the correct legal standards and that substantial evidence exists for the ALJ's decision. *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (citation omitted). For the purpose of judicial review, "[s]ubstantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted). Because the ALJ "is in the best position to determine the credibility of witnesses," *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008), this Court must accord the ALJ's credibility

determination "considerable deference," overturning it only if it is "patently wrong."

*Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (quotations omitted).

The ALJ must apply the five-step inquiry set forth in 20 C.F.R. § 404.1520(a)(4)(i)-(v)[2], evaluating the following, in sequence:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner]; (4) whether the claimant can perform her past work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (citations omitted) (alterations in original). "If a claimant satisfies steps one, two, and three, she will automatically be found disabled. If a claimant satisfies steps one and two, but not three, then she must satisfy step four. Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy." *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

After Step Three, but before Step Four, the ALJ must determine a claimant's residual functional capacity ("RFC") by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). In doing so, the ALJ "may not dismiss a line of evidence contrary to the ruling." *Id.* The ALJ uses the RFC at Step Four to determine whether the claimant can perform her own past relevant work and if not,

---

[2] The Code of Federal Regulations contains separate sections relating to DIB and SSI that are identical in most respects relevant to this case. For the sake of simplicity, this Entry generally contains citations to DIB sections only, but the Court will detail any differences when applicable.

at Step Five to determine whether the claimant can perform other work. *See* 20 C.F.R. § 404.1520(e), (g). The burden of proof is on the claimant for Steps One through Four; only at Step Five does the burden shift to the Commissioner. *See Clifford*, 227 F.3d at 868.

If the ALJ committed no legal error and substantial evidence exists to support the ALJ's decision, the Court must affirm the denial of benefits. *Barnett*, 381 F.3d at 668. When an ALJ's decision is not supported by substantial evidence, a remand for further proceedings is typically the appropriate remedy. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005). An award of benefits "is appropriate only where all factual issues have been resolved and the record can yield but one supportable conclusion." *Id.* (citation omitted).

## II.
### BACKGROUND

Ms. M. was 58 years of age at the time she alleged her disability began. [ECF No. 5-6 at 4.] She has completed high school and previously worked as factory floor supervisor and managing and training subcontractor. [ECF No. 5-7 at 10-11.][3]

The ALJ followed the five-step sequential evaluation set forth by the Social Security Administration in 20 C.F.R. § 404.1520(a)(4) and ultimately concluded that Ms. M. was not disabled. [ECF No. 5-2 at 24.] Specifically, the ALJ found as follows:

- Ms. M. last met the insured status requirements for DIB on December 31, 2015 (the date last insured or "DLI"). [4] [ECF No. 5-2 at 18.]

---

[3] The relevant evidence of record is amply set forth in the parties' briefs and need not be repeated here. Specific facts relevant to the Court's disposition of this case are discussed below.

[4] Ms. M. must prove the onset of disability on or before her DLI to be eligible for DIB. *See Shideler v. Astrue*, 688 F.3d 308, 311 (7th Cir. 2012); *see also* 20 C.F.R. § 404.131. Recognizing that Ms. M. also

- At Step One, Ms. M. had not engaged in substantial gainful activity[5] since April 15, 2012, the alleged onset date. [ECF No. 5-2 at 18.]

- At Step Two, she had "the following severe impairments: obesity, degenerative disc disease of the lumbar spine, and osteoarthritis of the bilateral knees." [ECF No. 5-2 at 18 (citations omitted).]

- At Step Three, Ms. M. did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. [ECF No. 5-2 at 18-19.]

- After Step Three but before Step Four, she had the RFC "to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she can lift, carry, push or pull ten pounds occasionally and five pounds frequently. She can stand and walk two hours in an eight-hour workday and sit six hours. She should avoid stooping, balancing, crouching, crawling and kneeling. She can occasionally climb ramps and stairs, but cannot climb ladders, ropes or scaffolds. She should not operate foot pedals bilaterally or work around hazards such as unprotected heights or unguarded, dangerous, moving machinery. Lastly, she should not work in extreme temperatures." [ECF No. 5-2 at 19.]

- At Step Four, relying on the testimony of the vocational expert ("VE") and considering Ms. M.'s RFC, she was incapable of performing any of her past relevant work as a floor supervisor and business trainer. [ECF No. 5-2 at 23.]

- At Step Five, relying on the VE's testimony and considering Ms. M.'s age, education, work experience, and RFC, she had acquired work skills from her past relevant work that were transferable to other representative occupations with jobs existing in significant numbers in the national economy that she could have performed through the date of the decision, including as a production clerk, personnel scheduler, and appointment clerk. [ECF No. 5-2 at 23-24.]

---

had a claim for SSI, the ALJ's subsequent findings properly considered the period at issue—spanning the combined claims—beginning with the alleged disability onset date, April 15, 2012, through the date of the decision. *See, e.g.,* [ECF No. 5-2 at 24.]

[5] Substantial gainful activity is defined as work activity that is both substantial (*i.e.*, involves significant physical or mental activities) and gainful (*i.e.*, work that is usually done for pay or profit, whether or not a profit is realized). 20 C.F.R. § 404.1572(a).

**III.**

**DISCUSSION**

Ms. M. raises three assignments of error, that the ALJ: (1) inadequately analyzed Listings 1.02 and 1.04, including by failing to consider all the regulatory examples of an inability to ambulate effectively, (2) did not follow the applicable SSA rulings in concluding that Ms. M. was capable of performing other work based on her RFC and transferable skills from her past relevant work, and (3) failed to acknowledge Ms. M.'s strong work history when assessing her credibility.

**A. Listings Analysis; Inability to Ambulate Effectively**

Ms. M. contends that the ALJ's analysis of Listings 1.02 and 1.04 was inadequate, being limited to no more than a simple list of the respective requirements and the ALJ's conclusions. [ECF No. 7 at 17.] Ms. M. acknowledges that the ALJ explained that he had given great weight to the opinion of a medical expert, Mark O. Farber, M.D., that no listing was met or equaled. [ECF No. 7 at 18 (citing ECF No. 5-2 at 21).] However, Ms. M. contends that Dr. Farber "did not specifically provide an explanation as to why all of the evidence that does support a meeting or equaling status is insufficient to make such a finding." [ECF No. 7 at 18.] Ms. M. also asserts that Dr. Farber's "testimony about the record is not even accurate." [ECF No. 7 at 18-19.] Ms. M. acknowledges that "an inability to ambulate effectively" is required by both of the relevant listings, but she asserts that the ALJ failed to consider all the regulatory examples of the functional requirement and also relied on his observations of her at the hearing, which she contends "is an inadequate reason to dismiss the requirement of effective ambulation." [ECF No. 7 at 20-22.]

To meet an impairment identified in the listings, a claimant must establish, with objective medical evidence, the precise criteria specified in the listing. *See* 20 C.F.R. § 404.1525; *Sullivan v. Zebley,* 493 U.S. 521, 530-31 (1990); *Rice v. Barnhart,* 384 F.3d 363, 369 (7th Cir. 2004) ("The applicant must satisfy all of the criteria in the Listing in order to receive an award of" benefits at Step Three). In the alternative, a claimant can establish "medical equivalence" in the absence of one or more of the findings if she has other findings related to the impairment or has a combination of impairments that "are at least of equal medical significance." *See* 20 C.F.R. § 404.1526(a)-(b). In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing. *See Brindisi ex rel. Brindisi v. Barnhart,* 315 F.3d 783, 786 (7th Cir. 2003); *Scott v. Barnhart,* 297 F.3d 589, 595-96 (7th Cir. 2003). For example, in *Minnick v. Colvin,* 775 F.3d 929, 935-36 (7th Cir. 2015), the Seventh Circuit found the ALJ's perfunctory analysis to warrant remand when it was coupled with significant evidence of record that arguably supported the listing. *See Kastner v. Astrue,* 697 F.3d 642, 647-48 (7th Cir. 2012) (remanding where the ALJ's cursory listing analysis failed to articulate a rationale for denying benefits when the record supported finding in the claimant's favor)). To demonstrate that an ALJ's listing conclusion was not supported by substantial evidence, the claimant must identify evidence of record that was misstated or ignored which met or equaled the criteria. *See*, *e.g.*, *Sims v. Barnhart,* 309 F.3d 424, 429-30 (7th Cir. 2002).

The ALJ's analysis of the relevant listings in the portion of the decision dedicated to his Step Three findings was conclusory. [*See* ECF No. 5-2 at 19.] However, other portions of the ALJ's decision provided further explanation of the ALJ's relevant analysis. The Seventh Circuit has explained "it is proper to read the ALJ's decision as a whole, and . . . it would be needless formality to have the ALJ repeat substantially similar factual analyses" throughout the decision. *Rice*, 384 F.3d at 370 n.5.

To begin with, the ALJ's Step Three conclusions were significantly bolstered by the opinion of the medical expert, Dr. Farber. The ALJ explained:

> I give Dr. Farber's opinion great weight as he has Social Security Disability program knowledge and experience as an independent, objective and impartial medical expert evaluating Social Security Disability cases. Further, he has had the opportunity to examine the entire medical record and offered explanation in support of his opinion, which is consistent with the record as a whole.

[ECF No. 5-2 at 21.] The Seventh Circuit has held that "[t]he ALJ may properly rely upon the opinion of … medical experts," as substantial evidence that no listing was met or equaled. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (citing *Scott v. Sullivan*, 898 F.2d 519, 524 (7th Cir. 1990); *Farrell v. Sullivan*, 878 F.2d 985, 990 (7th Cir. 1989)). In *Scheck*, the Seventh Circuit discussed the ALJ's "duty to 'minimally articulate his or her justification for rejecting or accepting specific evidence of disability,'" and found the absence of any contrary, supportive opinion a relevant factor in assessing whether the ALJ's listing conclusions were supported by substantial evidence. 357 F.3d at 700 (quoting *Steward v. Bowen*, 858 F.2d 1295, 1299 (7th Cir. 1988) (internal citations removed)). Here too, there is no supportive

medical opinion in favor of Ms. M. that contradicts the ALJ's or the medical expert's listing conclusions.

However, unlike in *Scheck*, where there was "*no evidence*" supporting a listing, 357 F.3d at 701 (emphasis in original), Ms. M. presents significant evidence that established the diagnostic and gross anatomical deformity requirements of Listing 1.02(A) for major dysfunction of a joint, including osteoarthritis of her bilateral knees, pelvic subluxation and hypomobility, limited and asymmetrical range of motion and strength in her lower extremities, and effusion—a sign of derangement—of her knee joints. [*See* ECF No. 7 at 18-20.] Listing 1.02(A) requires:

> Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;

20 C.F.R. § Pt. 404, Subpt. P, App. 1, 1.02.

Having found the other requirements met, the Court focuses, as Ms. M. does, on the last functional requirement—a requirement shared by both listings Ms. M. asserts were met or equaled—that her condition must result in an inability to ambulate effectively. The referenced regulatory section explains:

> b. What We Mean by Inability To Ambulate Effectively
>
> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate,

sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. [ . . . ]

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, 1.00(B)(2)(b).

The Court finds that substantial evidence supports the ALJ's conclusion that the functional requirement was not met or equaled and that the ALJ's written decision sufficiently articulated his rationale with reference to such relevant evidence.

Contrary to Ms. M.'s assertion, Dr. Farber's testimony did include a discussion of the evidence that would be relevant to the listing analysis, which the ALJ summarized, "Dr. Farber also noted conflicting exams where the claimant exhibited antalgic or unsteady gait at some exams, yet normal gait at other exams during the same time period." [ECF No. 5-2 at 18.] Dr. Farber testified:

So she's got degenerative disease of her knees. So when there's exams, now for instance, on, it's [Irving Haber, D.O.] at 13F. The knee has, lacks full terminal extension, the gait is very antalgic where she walks with a limp, full weight bearing he says, but there's some decrease in extension and mobility, now that's one exam. Then there is, for instance,

at 11F, Dr. Haber finds she had demonstrated an unstable gait pattern with abnormal stride and abnormal gait, the decrease weight bearing on the left side noted and tenderness. Then at 10F, page 8, and this is from 8/24/15, interestingly Dr. Haber's note was 6/15 of '15. Now this is somebody else who is seeing her at 8/24, gait and station, normal gait and station and tiptoe normal and heel walk normal. Than at 8F it's an internal medicine exam or orthopedic medicine exam by [Robert J. Burkle, M.D.], and Dr. [Burkle] says she walks on without a limp, has normal gait, no assistive devices needed. She did complain of pain in her back during the exam on page 4, she did say her hips and left knee hurt but that the strength in doing the range of motion she said that she had a limp, however, we had her walk in the hall, 46 feet, and she has a normal gait. I did not see any hesitation or abnormality, she walks at a normal pace and a quicker pace. So we have some conflict in whether she has a limp and how much problem that [she] has with the limp. In any event[,] my opinion is that based on the totality of the evidence, giving her credit for the fact that she is considerably overweight, she has bilateral knee osteoarthritis, she also has spinal stenosis and degenerative disease of her lumbosacral spine[,] I think that light work is, is not within reason for such an individual, I'd say this individual, so my feeling is that there's no listing met or equaled but I think that sedentary work should be possible with certain further restrictions.

[ECF No. 5-2 at 50-51.]

Conscious that symptoms may wax and wane and that Ms. M. specifically testified that her gait can change from day to day, there may have been an explanation for the seemingly conflicted evidence. [*See* ECF No. 5-2 at 59.] However, its noteworthy that the medical expert cited evidence showing that Ms. M. was able to fully bear her weight while walking during some examinations and also did not need to use any assistive devices. Under the standard of review, the Court "must examine the entire record, but we cannot reweigh the evidence or substitute our own judgment for that of the ALJ." *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000) (citing *Schroeter v. Sullivan*, 977 F.2d 391, 394 (7th Cir. 1992)). "If reasonable minds can differ as to whether [the claimant] is disabled, we must uphold the decision under

review." *Schmidt*, 201 F.3d 970, 972 (7th Cir. 2000) (citing *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996)).

Moreover, the ALJ provided a reasonable explanation as to how he resolved the conflict in the record. The ALJ detailed Ms. M.'s positive response to treatment, explaining that she "received an injection and participated in physical therapy, and by August 2016, she reported significant relief and was pleased with her functional progress, as she was independent and without discomfort or difficulty with daily activities or functional activities. She even reported that she was off medications." [ECF No. 5-2 at 21 (internal citations omitted).] The ALJ explained that Ms. M.'s activities of daily living included aerobic classes and walking for exercise three to five times a week. [ECF No. 5-2 at 22.]

The ALJ's description of the record was supported by substantial evidence. On October 28, 2014, Ms. M. reported to her treating provider that "[s]he exercises 3 to 5 times each week. Her exercise regimen consists of aerobic classes, walking, and yoga." [ECF No. 5-11 at 5.] On January 13, 2015, Ms. M.'s treating provider documented the following concerning Ms. M.'s pain:

> Patient advised she was prescribed DMSO 20%/Diclofenac 10% cream on her previous visit, and she loves the cream, as it is effectively controlling her pain complaints. Patient explained she has completed her previously ordered formal physical therapy program and felt the therapy was beneficial in reducing her pain complaints. Patient further explained she continues to participate in her home exercise program on a daily basis. Patient stated when she experiences increased pain complaints, she takes Ibuprofen, and this makes her pain tolerable.

[ECF No. 5-11 at 18.] On August 5, 2016, Ms. M. reported "she is feeling better and rates her pain at 2/10." [ECF No. 5-12 at 32.] On August 19, 2016, she reported "that

she is off her meds now. She is very pleased with her functional progress." [ECF No. 5-12 at 34.] Ms. M. reported her current pain level was "0/10" and her "condition has improved." [ECF No. 5-12 at 34.] The evidence of Ms. M.'s functional improvement and ability to specifically walk for exercise undermines her contention that she was unable to ambulate effectively, such that she was not able to perform daily tasks consistent with the functional severity required by the listing.

Ms. M. argues that the ALJ cannot analyze only supportive evidence and must confront evidence that does not support his conclusion, but Ms. M. does not specifically identify any evidence that the ALJ failed to confront. [*See* ECF No. 7 at 22-23.]

Ms. M. does take issue with the testimony of Dr. Farber that Ms. M.'s knee effusions had resolved. [ECF No. 7 at 18-19 (citing ECF No. 5-2 at 49 (Dr. Farber summarized the evidence from January 2015 and testified, "I think her knee effusions has [sic] since gone away.")).] Ms. M. accurately points out that some of the most recent treatment evidence of record—which was also the evidence that the Appeals Council remanded the claim back to the ALJ to consider—conflicts with Dr. Farber's summary. [ECF No. 7 at 19 (citing ECF No. 5-13 at 6).] On November 4, 2016, Ms. M. returned to Dr. Haber for pain management and reported "a significant increase in her bilateral knee pain," and "modified ADL [activities of daily living] and [f]unctional activity." [ECF No. 5-13 at 6.] She was noted to be "ambulating with bilateral walking sticks," although the examination findings also reference a "single point cane." [ECF No. 5-13 at 6.] Dr. Haber's examination findings further indicated

"moderate effusion" of the knees, decreased range of motion and muscle strength, and that she "moves poorly."  [ECF No. 5-13 at 6.]

However, it is not clear from the record to what degree, if any, the continued presence or reoccurrence of knee effusion would have affected Dr. Farber's conclusions.  Ms. M.'s hearing representative declined to cross-examine Dr. Farber about his summary of the evidence or his assessments of Ms. M.'s functioning.  [*See* ECF No. 5-2 at 53.]  It is also not clear how relevant the clinical sign is to a listing that does not specifically require or mention effusion.  The examination itself— beyond the evidence of effusion—is relevant to an analysis of Ms. M.'s ability to ambulate effectively, including her poor movement and need to use an ambulatory aid potentially in both hands.

Most important to the Court's analysis here, the ALJ specifically confronted the examination findings detailed above.  [*See* ECF No. 5-2 at 21.]  However, the ALJ explained:

> Dr. Haber also recommended she see an orthopedic doctor; however, the claimant failed to follow-up, which suggests that her symptoms may not have been as serious as has been alleged.  Further, I note at the hearing she ambulated with a slight limp, yet she did not present with an assistive device, and she certainly appeared to ambulate effectively, even though she is obese.

[ECF No. 5-2 at 21 (citing ECF No. 5-13 at 7 (Dr. Haber's treatment plan included "[n]o further treatments scheduled.  Ortho[pedic] eval[uation] may be appropriate.")).]  Inconsistencies with the severity of symptoms reported at the hearing and those reported while seeking treatment or the failure to regularly seek treatment for those symptoms can support an ALJ's credibility finding.  *See*

14

*Sienkiewicz v. Barnhart*, 409 F.3d 798, 803-04 (7th Cir. 2005). Ms. M. demonstrated a positive response to treatment in the past, but there is no indication that she either sought an orthopedic evaluation—after she reported increased symptoms in November 2016—or that she pursued further pain management treatment with Dr. Haber.

Furthermore, at her hearing just over a year later, Ms. M presented without the use of any ambulatory aid and appeared to ambulate effectively according to the ALJ's observations. Ms. M. contends that this reasoning is inadequate to find against her, but she does not support her argument with any legal authority. [*See* ECF No. 7 at 21.] The Seventh Circuit has held:

> To the contrary, an ALJ's observations are adduced at the hearing just as the testimony and evidence given before any finder of fact are all part of the case which the trier of fact decides. We have held that "an ALJ does not commit an impropriety when he relies on his own observations during a hearing concerning the severity of a claimant's claim. Such observations are credibility determinations and are entitled to considerable weight."

*Kelley v. Sullivan*, 890 F.2d 961, 964 (7th Cir. 1989) (quoting *Whitney v. Schweiker*, 695 F.2d 784, 788 (7th Cir. 1982)). There are perhaps limits to what an ALJ can reasonably observe at a hearing. In *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (emphasis in original), the Seventh Circuit explained:

> We doubt the probative value of any evidence that can be so easily manipulated as watching whether someone *acts* like they are in discomfort. However, we note that even those courts cited by Powers as opposing the "sit and squirm" test endorse the validity of a hearing officer's observations of the claimant.

(citing *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992); *Miller v. Sullivan*, 953 F.2d 417, 422 (8th Cir. 1992); *Lovejoy v. Heckler*, 790 F.2d 1114, 1116 (4th Cir. 1986); *Lovelace v. Bowen*, 813 F.2d 55, 60 (5th Cir. 1987)). The Seventh Circuit concluded, "[l]ikewise, we have repeatedly endorsed the role of observation in determining credibility and refuse to make an exception in this situation." *Powers*, 207 F.3d at 436 (citing *Dray v. Railroad Retirement Bd.*, 10 F.3d 1306, 1314 (7th Cir. 1993); *Erhart v. Sec'y of Health and Human Servs.*, 969 F.2d 534, 541 (7th Cir. 1992); *Strunk v. Heckler*, 732 F.2d 1357, 1362 (7th Cir. 1984)). Here, the ALJ's simple observation that Ms. M. appeared at the hearing without any ambulatory aid is self-evident and certainly relevant. Notably, the mention of Ms. M. using two walking sticks (or possibly a single point cane) in November 2016 appears to be the sole evidence of her using any kind of an ambulatory aid. Even the ALJ's more involved conclusion that Ms. M. demonstrated an ability to ambulate effectively is not particularly problematic. The listing involves an assessment as to whether the claimant can carry-out routine activities without severe interference with ambulation. While the ALJ's opportunity to observe Ms. M.'s ability to walk during the hearing was likely quite limited both in duration and distance, the fact itself that she was able to appear at the hearing without any kind of assistance with ambulation supported the idea that she could carry-out daily activities that required similar functional abilities.

Accordingly, for all the reasons detailed above, the Court concludes that the ALJ's listing conclusions were supported by substantial evidence and that such evidence was adequately presented by the ALJ in the written decision.

**B. Step Five Determination; Transferable Skills**

Ms. M. also challenges the basis of the ALJ's Step Five determination, citing Social Security Ruling ("SSR") 96-9p and SSR 82-41. [ECF No. 7 at 24-26.] In particular, Ms. M. contends that: (1) the VE did not specifically identify the transferable skills to sedentary work that Ms. M had gained through her work experience, (2) she has had "no training in the far more complex computer systems of today," (3) "[n]either the ALJ nor the VE took [Ms. M.'s] ability to successfully learn to operate new and advanced technology into consideration," and (4) the ALJ "did not address [Ms. M.'s] testimony that because of her pain and physical decline, her memory and focus [were] impaired." [ECF No. 7 at 24-25.]

Ms. M. cites to SSR 96-9p that "[a]n RFC for less than a full range of sedentary work reflects very serious limitations resulting from an individual's medical impairment(s) and is expected to be relatively rare." [ECF No. 7 at 24 (quoting SSR 96-9p (S.S.A. July 2, 1996), 1996 WL 374185, at *1).] The following sentence in the ruling makes clear:

> However, a finding that an individual has the ability to do less than a full range of sedentary work *does not necessarily equate with a decision of "disabled."* If the performance of past relevant work is precluded by an RFC for less than the full range of sedentary work, consideration must still be given to whether there is other work in the national economy that the individual is able to do, considering age, education, and *work experience.*

SSR 96-9p, 1996 WL 374185, at *1 (emphasis added). Ms. M. also cites the ruling for

the following:

> Where there is more than a slight impact on the individual's ability to
> perform the full range of sedentary work, if the adjudicator finds that
> the individual is able to do other work, the adjudicator must cite
> examples of occupations or jobs the individual can do and provide a
> statement of the incidence of such work in the region where the
> individual resides or in several regions of the country.

[ECF No. 7 at 24 (quoting SSR 96-9p, 1996 WL 374185, at *5).] The preceding

sentence of the ruling is also relevant:

> Whether the individual will be able to make an adjustment to other work
> requires adjudicative judgment regarding factors such as the type and
> extent of the individual's limitations or restrictions and the extent of the
> erosion of the occupational base; i.e., the impact of the limitations or
> restrictions on the number of sedentary unskilled occupations or the
> total number of jobs to which the individual may be able to adjust,
> considering his or her age, education, and work experience, *including
> any transferable skills* or education providing for direct entry into skilled
> work.

SSR 96-9p, 1996 WL 374185, at *5 (emphasis added).

Ms. M. does not develop any argument based on SSR 96-9p. Regardless, the

ALJ followed the ruling. As detailed above, the ALJ found that Ms. M. was capable

of a reduced range of sedentary work. The ALJ's RFC finding matched the medical

expert, Dr. Farber's assessment of Ms. M.'s limitations. [*See* ECF No. 5-2 at 51-52.]

The ALJ posed a hypothetical to the VE that described those same limitations and

the VE testified that there were jobs available in the national economy that an

individual could have performed with those limitations and utilizing the transferable

skills Ms. M. had gained through her past work experience. [ECF No. 5-2 at 56.] The

VE provided examples of such jobs, including as a production clerk, personnel

scheduler, and appointment clerk, and further approximated the number of jobs available in the national economy for each example, which totaled 349,000 combined jobs in the representative examples. [ECF No. 5-2 at 55.] The ALJ specifically inquired and the VE confirmed that it was her opinion that these jobs could be performed with the significant limitations that were identified, including "even with no postural activities." [ECF No. 5-2 at 56.]

Ms. M.'s hearing representative did not cross-examine the VE as to any portion of her relevant opinion, except to ask, "On the transferable skills that you discussed[,] how much paperwork or computer work is going to be part of what she's doing?" [ECF No. 5-2 at 57.] The VE responded, "I would say that it would be involved in most everything that she would be doing on these jobs." [ECF No. 5-2 at 57.]

To the extent that Ms. M. has developed a challenge to the ALJ's Step Five determination, the arguments pertain to Ms. M.'s ability to perform the jobs identified based on transferable skills from her past relevant work. Ms. M. contends that the VE did not identify the specific skills that Ms. M. acquired in the performance of her past work. [ECF No. 7 at 24-25.] The VE was asked if Ms. M. had any transferable skills to sedentary work and the VE testified in response:

> I think so, I think so. Ms. [M.] had extensive experience like I said in the area of production, which would lend itself to production scheduling, personnel scheduling. She managed many people at one time when you look at her own description of, of work, I forget which one. Oh, at 10E is an excellent example where she's talking about managing the production flow. Again[,] this person just simply, this was a highly skilled posit[i]on and I think it would lend itself to any kind of personnel management, personnel scheduling, production clerk, appointment clerk. There's [sic] several sedentary, semiskilled jobs that I think would utilize skills she developed.

[ECF No. 5-2 at 54-55.]  After the VE identified the jobs and numbers available, the ALJ followed-up, asking, "What skills did you say would be transferable to these positions?"  [ECF No. 5-2 at 55.]  The VE testified:

> Primarily her -- in the situation of production clerk, her knowledge of production practices and the underlying principles of getting a product from beginning to, to end.  Her personnel scheduling would be from her management background and the appointment clerk would just simply be as a result of her coordination of personnel, I mean again she, she managed large numbers of people.

[ECF No. 5-2 at 55.]  The ALJ identified the transferable skills in the decision as including "knowledge of production practices with underlying principles of getting product from beginning to end, personnel scheduling and overall management skills with coordination of personnel and materials."  [ECF No. 5-2 at 23.]

Ms. M. cites SSR 82-41 for the definition of a skill in this vocational context. [ECF No. 7 at 25.]  The ruling explains:

> A skill is knowledge of a work activity which requires the exercise of significant judgment that goes beyond the carrying out of simple job duties and is acquired through performance of an occupation which is above the unskilled level (requires more than 30 days to learn).  It is practical and familiar knowledge of the principles and processes of an art, science or trade, combined with the ability to apply them in practice in a proper and approved manner.  This includes activities like making precise measurements, reading blueprints, and setting up and operating complex machinery.  A skill gives a person a special advantage over unskilled workers in the labor market.

SSR 82-41 (S.S.A. Jan. 1, 1982), 1982 WL 31389, at *2.  The Seventh Circuit had held, in agreement with two other circuits, that "'judgment' is too vague to constitute such a skill."  *Villano*, 556 F.3d at 563-64 (citing *Draegert v. Barnhart*, 311 F.3d 468, 475-

76 (2d Cir. 2002); *Ellington v. Sec'y of Health & Human Servs.*, 738 F.2d 159, 159-61 (6th Cir. 1984)). In *Draegert*, the Second Circuit explained:

> The only so-called "skills" mentioned by the VE were Draegert's (1) "ability to learn and apply rules and procedures, which are sometimes hard to understand," (2) "ability to use reason and judgement in dealing with all kinds of people," (3) "ability to think clearly and react quickly in an emergency," (4) "ability to keep physically fit," (5) "ability to make conclusions based on facts and on one's personal judgment," and his (6) "ability to change easily and frequently from one activity to another[.]" These abilities, when not linked to any particular tasks, are merely traits or aptitudes, not job skills, for "[w]orker traits[,] to be relevant[,] must have been used in connection with a work activity," and neither the VE, nor the ALJ, who relied on the VE's testimony in finding that Draegert had transferable "skills," gave any explanation as to how these abilities and aptitudes had been used in connection with Draegert's prior work or had been refined by occupational experience into an acquired work skill.

311 F.3d at 476 (quoting SSR 82-41, 1982 WL 31389, at *3) (internal citations omitted). When an ability is merely a character trait or aptitude, and not linked to any specific job task or refined through the claimant's occupational experience, the ability does not constitute a skill to be considered for transferability. The Sixth Circuit has further explained:

> "Independence of judgment" and "responsibility for a work product" are too vague to constitute particular skills which are transferable. If "independence of judgment" and "responsibility for a work product" are to be considered skills independent of any particular tasks a claimant can perform, there is then no basis for distinguishing claimant's skills from those of a lawyer, a secretary or a nuclear physicist.

*Ellington*, 738 F.2d at 161.

Conversely, in *Parrott v. Astrue*, 493 F. App'x 801, 805 (7th Cir. 2012), the Seventh Circuit held in an unpublished decision "that the advanced communication and supervisory skills that Parrott would have developed as a park-district director

are vocational skills within the meaning of the Social Security Act and could be transferred to other jobs." *Id.* (citing *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 857 (6th Cir. 2010) (agreeing with ALJ that supervisory skills are vocational skills that are transferable between industries); *Albors v. Sec'y of Health & Human Servs.*, 817 F.2d 146, 148 (1st Cir.1986) (distinguishing between the mere ability to communicate and the transferable communication skills possessed by executives).  The First Circuit held that the "claimant's past managerial work was a fairly highly skilled one, that claimant had developed valuable interpersonal, analytical, and intellectual skills performing it, and that these skills generally were transferable." *Albors*, 817 F.2d at 148.  Furthermore, another district judge in the Southern District of Indiana upheld an ALJ's decision over a challenge to the VE's testimony, who had identified "scheduling, recordkeeping, ordering, and taking inventory" as the transferable skills obtained by the claimant. *Smith v. Colvin*, No. 1:15-CV-01236-TWP-MJD, 2017 WL 242550, at *3-4 (S.D. Ind. Jan. 19, 2017).

The Court finds that the ALJ identified specific skills to be considered for transferability.  The ALJ's identification of Ms. M.'s production skills in the written decision, described as "knowledge of production practices with underlying principles of getting product from beginning to end," may seem somewhat vague as to the particular skills involved in a typical production cycle.  [*See* ECF No. 5-2 at 23.]  The VE specified that "production scheduling" was among those skills.  [ECF No. 5-2 at 54.]  The ALJ began getting testimony from the VE by asking if she had reviewed Ms. M.'s "pretty detailed explanation of her work at Exhibit 5E, more detailed that I can

probably get through testimony." [ECF No. 5-2 at 53 (Exhibit 5E and 10E are duplicative materials provided by Ms. M.]  The VE responded, "I did." [ECF No. 5-2 at 53.]  The materials provided to the SSA by Ms. M. included her own description of her past work experience.  [*See* ECF No. 5-7 at 22-24.]  Ms. M identified herself as "skilled in lean manufacturing concepts and practices including continuous process improvement, standardized work, value stream mapping, ergonomics, takt time, workplace organization (5-S), and eyes for flow." [ECF No. 5-7 at 22.]  She also identified "work order scheduling, execution, closing, and follow[-]up," as being among her responsibilities during subcontracting work that she performed through until November 2010, which was less than eighteen months before she alleged her disability began.  [ECF No. 5-7 at 22.] She also "[h]elped implement RFID tags to track inventory of proper products being used and[/]or on hand." [ECF No. 5-7 at 23.] Her job tasks at a previous position included that she "[p]erformed scheduled cycle counts to validate inventory accuracy." [ECF No. 5-7 at 23.]  Ms. M.'s practical knowledge of production concepts and principles gleaned through her work experience are not merely traits or aptitudes, but specific skills that would give her a distinct advantage over unskilled workers in production-related occupations.  For example, the evidence showed that Ms. M. had knowledge of specific methods and processes for tracking inventory with assurances of accuracy.

The Court also finds that personnel scheduling is a specific skill that would be useful in a variety of occupations, including as a personnel scheduler.  Ms. M.

described her supervisor experience as including "time and attendance using SAP" software. [ECF No. 5-7 at 22.]

Further, Ms. M. had supervisory abilities that were specific enough to meet the definition of a skill. She listed interpersonal communications skills under her areas of expertise. [ECF No. 5-7 at 22.] She described her experience as serving "as the go to person being the mediator, liaison, between the subcontractor(s) and factory floor." [ECF No. 5-7 at 23.] She also described that she "[m]anaged outside grounds and the sub-contractor over four separate facility locations, ensuring that the mutual agreed contract with the sub-contractors was adhered to." [ECF No. 5-7 at 23.] Further, she "[e]xecuted sign in sheets for meetings when I needed something changed, as a paper trail, stating what, why and how. I had employees sign it which symbolized they are aware and understood what was needed, why it was needed and expected." [ECF No. 5-7 at 23.] Along a spectrum of relevant skills, SSR 82-41 provides the example that "[t]he president or chief executive officer of a business organization may need exceptional ability to deal with people, organize various data, and make difficult decisions in several areas of knowledge." 1982 WL 31389, at *4. As explained above, under *Parrott*, these interpersonal and supervisory abilities qualify as skills to be considered for transferability.

As to whether Ms. M would be able to utilize those skills, she contends that she "is more than sixty years old, with only a remote high school education, and no training in the far more complex computer systems of today. Technology and computer systems have changed considerably since the time [she] was employed, and

24

she testified that the majority of her work took place on the floor around the people, not at a computer." [ECF No. 7 at 25 (citing ECF No. 5-2 at 58).] Ms. M. was asked during the hearing how far she went in school, and she responded, "High school. I took a few computer or college classes but -- [.]" [ECF No. 5-2 at 58.] Her representative then asked, "And how much of your old jobs dealt with you using computer software, paper, scheduling, things like that?" [ECF No. 5-2 at 58.] Ms. M. testified in response, that she "did work-related things but not really mind work with people more than anything." [ECF No. 5-2 at 58.] As noted above, in the materials provided by Ms. M. that were reviewed by the VE, Ms. M. listed her ability to use a specific brand of software, SAP, among her recent work experience when tracking employee time and attendance. She also described her relevant experience as being involved in a "[t]otal update within security headquarters which included [a] new computer system, monitors, badge readers, alarms, and emergency systems." [ECF No. 5-7 at 22.] Substantial evidence supports that Ms. M. has had more recent experience with the use of computers—including practical experience with specific software, as well as classwork—than she contends on appeal.

Ms. M. also asserts that "[n]either the ALJ nor the VE took [Ms. M.'s] ability to successfully learn to operate new and advanced technology into consideration." [ECF No. 7 at 25.] The regulations include the additional, relevant requirement concerning transferability of skills for claimants:

> If you are of advanced age and you have a severe impairment(s) that limits you to no more than sedentary work, we will find that you have skills that are transferable to skilled or semiskilled sedentary work only if the sedentary work is so similar to your previous work that you would

need to make very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry.

20 C.F.R. § 404.1568(d)(4). SSR 82-41 further provides:

In order to establish transferability of skills for such individuals, the semiskilled or skilled job duties of their past work must be so closely related to other jobs which they can perform that they could be expected to perform these other identified jobs at a high degree of proficiency with a minimal amount of job orientation.

1982 WL 31389, at *5. The ALJ asked the VE during the hearing, "So what in your opinion would be the vocational adjustment to these jobs? Would it be significant or – [?]" [ECF No. 5-2 at 56.] The VE testified, "I think it would be minimal." [ECF No. 5-2 at 56.] The ALJ followed-up, "How long do you think it would take?" [ECF No. 5-2 at 56.] The VE responded, "Thirty days to learn whatever kind of specific practices are performed by a specific employer. There may be different software that she would have to learn but it would be similar, I'm sure, to that which she used in her past relevant work." [ECF No. 5-2 at 56.] Both the ALJ and the VE considered the adjustment that would be necessary, and substantial evidence supported the ALJ's conclusion that the adjustment would be minimal.

To the extent that Ms. M. now raises on appeal that she would not be able to use modern computers or technology to make a successful adjustment and that she does not have specific skills that would be transferable—for example relevant to the Court's discussion above about the specific production-related skills she had attained through her work experience—the Court notes that Ms. M.'s representative did not raise these issues with the VE during the hearing. As noted above, Ms. M.'s representative only established in cross-examination that Ms. M. would need to use

computers and paperwork to perform the jobs based on her transferable skills. Ms. M.'s representative had the opportunity to press the VE about the specific skills that would be involved in the process of getting a product from beginning to end. The representative could have also inquired into the VE's specific knowledge about the type of software used by Ms. M. and how similar or different it was to typical software used in the representative occupations that were possible based on a Ms. M.'s transferable skills. The Supreme Court has explained in a recent decision evaluating an ALJ's evidentiary burden—under the substantial evidence standard—based on VE testimony that "an applicant may probe the strength of testimony by asking an expert about (for example) her sources and methods—where she got the information at issue and how she analyzed it and derived her conclusions." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1156 (2019) (citing, *e.g.*, *Chavez v. Berryhill*, 895 F.3d 962, 969-70 (7th Cir. 2018)). The Supreme Court further explained that "even without significant testing, a factfinder may conclude that testimony has sufficient indicia of reliability to support a conclusion about whether an applicant could find work." *Biestek*, 139 S. Ct. at 1157. The Seventh Circuit has further explained that when the VE's "testimony merely supplemented (and did not conflict with) the Dictionary of Occupational Titles (DOT), [it] means that [the claimant] forfeited these arguments by failing to object to the testimony during the administrative hearing." *Brown v. Colvin*, 845 F.3d 247, 254 (7th Cir. 2016) (citing *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009) (claimant forfeited argument regarding reliability of data underlying vocational experts' job-numbers opinions by failing to object during

hearing); *Barrett v. Barnhart,* 355 F.3d 1065, 1067 (7th Cir. 2004) (same)).

Accordingly, the Court finds that substantial evidence supported the ALJ's conclusion

that Ms. M. could have performed other work with only a minimal adjustment period.

Ms. M. also contends that the ALJ "did not address [Ms. M.'s] testimony that

because of her pain and physical decline, her memory and focus are impaired." [ECF

No. 7 at 25.] However, Ms. M. does not present any evidence of record supporting her

contention beyond on her own testimony. The Seventh Circuit has "long held that an

ALJ is not required to provide a 'complete written evaluation of every piece of

testimony and evidence'. . . ." *Rice,* 384 F.3d at 370 (quoting *Diaz v. Chater,* 55 F.3d

300, 308 (7th Cir. 1995)). To the extent that Ms. M.'s argument is a challenge to the

ALJ's RFC finding, the Seventh Circuit has held that "the ALJ is required only to

incorporate into his hypotheticals those impairments and limitations that he accepts

as credible." *Schmidt v. Astrue,* 496 F.3d 833, 846 (7th Cir. 2007). As detailed above

when discussing Ms. M.'s listing argument, the ALJ summarized substantial

evidence that Ms. M. had reported a complete reduction in her pain with treatment.

An ALJ is permitted to consider the effectiveness of treatment in making his

credibility determination. *Lambert v. Berryhill,* 896 F.3d 768, 777 (7th Cir. 2018).

The ALJ also explained that the record undermined Ms. M.'s later complaints of

increased pain because it did not provide evidence of any further treatment.

Furthermore, no physician assessed that Ms. M. had any limitation with memory or

focus because of her pain. *See Rice,* 384 F.3d at 370 ("More importantly, there is no

doctor's opinion contained in the record which indicated greater limitations than

those found by the ALJ.").  For all the reasons above, the Court does not find any error with the ALJ's Step Five determination.

**C**. **Subjective Symptom Evaluation; Work History**

Ms. M. also contends that the ALJ failed to take into consideration her strong work history when assessing her credibility.  [ECF No. 7 at 27.]

As noted in the standard of review section, an ALJ's credibility evaluation is accorded considerable deference.  Reviewing courts examine whether a credibility determination was reasoned and supported; only when an ALJ's decision "lacks any explanation or support . . . will [the Court] declare it to be 'patently wrong.'" *Elder v. Astrue,* 529 F.3d 408, 413-14 (7th Cir. 2008).  "We will uphold an ALJ's credibility determination if the ALJ gave specific reasons for the finding that are supported by substantial evidence." *Moss v. Astrue,* 555 F.3d 556, 561 (7th Cir. 2009) (citing *Arnold v. Barnhart,* 473 F.3d 816, 823 (7th Cir. 2007)).

On March 28, 2016, SSR 16-3p (S.S.A Oct. 25, 2017), 2017 WL 5180304, at *2, became effective, replacing SSR 96-7p, and providing new guidance regarding how a disability claimant's statements about the intensity, persistence, and limiting effects of symptoms are to be evaluated.  Under SSR 16-3p, an ALJ now assesses a claimant's subjective symptoms rather than assessing her "credibility." *Id*.  The Seventh Circuit has explained that the "change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character; obviously administrative law judges will continue to assess the credibility of pain *assertions* by applicants, especially as such assertions often cannot be either credited or rejected on

the basis of medical evidence." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (emphasis in original). Still, the standard remains whether the ALJ's assessment was patently wrong.

The ruling specifies that the SSA uses "all of the evidence to evaluate the intensity, persistence, and limiting effects of an individual's symptoms," but continues to utilize the regulatory factors relevant to a claimant's symptoms, including daily activities, the location, duration, frequency, and intensity of pain or other symptoms, factors that precipitate and aggravate the symptoms, the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; and treatment, other than medication, an individual receives or has received for relief of pain or other symptoms. SSR 16-3p, 2017 WL 5180304, at *7-8; 20 C.F.R. § 404.1529(c)(3).

The Seventh Circuit has explained that "[a]n ALJ is not statutorily required to consider a claimant's work history, but 'a claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability.'" *Stark v. Colvin*, 813 F.3d 684, 689 (7th Cir. 2016) (quoting *Hill v. Colvin,* 807 F.3d 862, 868 (7th Cir. 2015); *Rivera v. Schweiker,* 717 F.2d 719, 725 (2d Cir. 1983)). Here, the Court has already detailed numerous, specific reasons that the ALJ provided for discounting Ms. M.'s credibility. Accordingly, the Court declines to provide any extended analysis that would be redundant and concludes that the ALJ's subjective symptom evaluation was not patently wrong.

While Ms. M.'s work history is one factor that supported her credibility generally, it was also notable that Ms. M.'s work history was a significant reason that she was denied based on the considerable skills that she attained while working. Ms. M. testified that she did not believe those skills could be utilized in employment without an ability to be "out on the floor." [ECF No. 5-2 at 58.] However, the VE disagreed to the extent she testified that there were sedentary jobs available in the national economy that could have been performed even with the significant limitations that Dr. Farber assessed. The Court cannot find that the ALJ was unaware of Ms. M.'s rather exemplary work history. And the Court cannot find that the ALJ erred in applying the SSA's regulations and rules which require that the ALJ consider how that work history contributed to Ms. M.'s ability to find other work. Neither the ALJ nor this Court has any ability to reconsider the law as determined by Congress and implemented by the SSA. Accordingly, the ALJ's decisions is affirmed.

## IV.
### CONCLUSION

"The standard for disability claims under the Social Security Act is stringent." *Williams-Overstreet v. Astrue*, 364 F. App'x 271, 274 (7th Cir. 2010). Taken together, the Court can find no legal basis presented by Ms. M. to reverse the ALJ's decision that Ms. M. was not disabled during the relevant time period. Therefore, the decision below is **AFFIRMED**. Final judgment will issue accordingly.

Date: 9/30/2019

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Lu Han
SOCIAL SECURITY ADMINISTRATION
lu.han@ssa.gov

Charles D. Hankey
charleshankey@hankeylawoffice.com

Julian Clifford Wierenga
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
julian.wierenga@usdoj.gov